all right our first case for the day is United States x-rail silver versus Omnicare number 16-4418 good morning your honors Shauna Itchery on behalf of the appellant mark silver I would like to reserve five minutes for rebuttal that is granted and welcome to welcome to New Jersey thank you um your honors I would be helpful to first start with the reimbursement structure that's relevant to this case it puts the alleged public disclosures and the relator specific allegations into context okay there's two types of patients I just ask you about this chart first has counsel seen this yes okay good all right thank you there are two types of patients in nursing homes the first type is a part a patient the part a patient comes directly from the sick a stays for 90 days then there is a part B or B or Medicaid patients they're the majority of the people in the nursing home population they are there a long term they need being helped taking care of basically reimbursed from 91 days on the 1998 balanced budget act changed the way the reimbursement worked for Medicare part a instead of getting a flat rate for services getting services from a provider to the nursing home and then filling the government and getting a dollar for dollar amount back the government decided that it would pay a flat rate per patient per day for each of the nursing home's patients for the record you're pointing out that's part a part a yes and so this incentivizes the risk the nursing home if the cost exceeded the flat rate reimbursement the nursing home had to pay those extra costs so the nursing home was incentivized then to negotiate providers to receive the lowest cost possible now this was different than the Medicare Part D and Medicare Part B and the Medicaid patients on this side what would happen was is the providers would service the nursing homes and the providers would include D&E providers clinical laboratories ambulance so on and so forth they would service the nursing home and then bill and get directly reimbursed from the government at a fee for service or a dollar for dollar basis now this is where the public disclosures come in your honors what the government realized is that this had a potential for some anti-kickback violations and what they realized that at some point the nursing home of the providers in order to get a nursing home as a client to be able to service the larger Part D and Medicaid population it could potentially offer discounted prices to the nursing home to be able to gain the Medicare Part D. So you have these providers competing in this case the institutional pharmacies competing because they want the whole business so the way it works is that if they can get the nursing home to sign on by giving them they can charge market rates or whatever for the prescriptions exactly right your honors and it wasn't just institutional pharmacies it was all providers of course Silver didn't uncover all of this this is all public information this is all public information the structure and the public information the district pointed to seven documents one of the documents was a 1999 OIG advisory opinion very very general it talks about the provider being an ambulance provider and it was the ambulance provider had also dealt with Part B does that matter Part B yes it does matter it was not specific to the pharmaceutical reimbursement institutional pharmacies it was basically just saying hey the discounted pricing offered to providers could potentially serve as an anti-kickback violation if the discount was below a fair market value that was what the government was getting out in these public available information in these advisory opinions the next one was from 2000 it said the same thing it was a footnote with two sentences that talked about this financial arrangement between between providers and nursing homes and if it was discounted below a fair market value it could potentially be a but so that that was swapping with A and B right yes A and B as well as the next one 2008 it was a paragraph in a 26 page report definitely just dealt with swapping it also provided a list of 10 types of providers very very general public information here but the idea of swapping is is not unique is I mean it was in the public domain that there was in fact swapping going on it wasn't in the public domain that swapping was going on it was in the public domain that this is a potential for swapping swapping is as offering discounted rates and that swapping could potentially violate the anti-kickback statute but to advance your argument a little bit I maybe this isn't where you're going but the swapping in a lot of these reports dealt with non pharmaceuticals right yes the only one that dealt with pharmaceuticals with this 2004 CMS review of current standards practice for long-term care pharmacies and this didn't all it said was it out of three it cited three paragraphs the district court cited three paragraphs and all it said was that long-term care pharmacies are concerned that offering nursing facilities rates lower than Medicaid's rate for non Medicaid residents could be viewed as an inducement it wasn't an allegation of fraud it was just that the long-term care pharmacies are concerned that these discounted rates might be viewed as an inducement may I read to you from a from the district court determination the district court held that publicly disclosed health and human services office of the opinion stated that swapping transactions may be taking place between nursing homes and various service providers is it doesn't that establish that this was in it was known in the industry that this was taking place in our opinion the district court took some liberties with the interpretation of those guidances it wasn't known that nursing homes were engaged in swapping with pharmaceutical the district court got it wrong in our opinion yes your honor we think that the district court viewed those publicly available information the district court was referring to a an advisory opinion of the inspector general the HHS OIG the opinion that saying that swapping transactions may be taking place yes he was viewing the ones I just mentioned it was a 2000 and a 2008 that referenced swapping in terms of our claim is that and what the related provided is that very specific information that the defendant for America was offering kickbacks and he detailed the form of the kickback and this was not public knowledge the kickback was a per diem rate per patient per day isn't that swapping that is swapping yes your honor but he also provided very specific information that the contracts the amounts of the discount he was a pharmacy owner and a nursing home operator for many years he dealt with Omnicare he dealt with Omnicare yes sir he also dealt with a variety of other pharmacies he was also head of a lot of associations and went to regional and I'm just trying to get something more precise what did silver discover that the exact pricing that was going on the exchange that was taking place or what exactly was unique about what he discovered it was unique in that the form of the discount was the per diem rate he knew the per diem rate he knew that the per diem rate was below cost that was not in the public disclosures he also discovered that the fact that these contracts they had what was called true up clauses and those true up clauses facially hid the scheme what the true up clauses said was that every quarter for America would do an accounting and they would account for the amount that was charged to the nursing home the per diem amount and compare that to the actual but they never enforced those true up clauses they were just placed in the contract to facially hide the scheme so that to the close observer it would look as though they were compliant with the anti kickback statute but they actually weren't and our Mr. Mark Silver he discovered that he brought that to the government so how did he discover it Mark Silver he received contracts he negotiated contracts with for America had offered him some per diems he never accepted those he had relationships with nursing homes and he talked with administrators but not this particular defendant Southgate was a nursing home in New Jersey that received a rate of $22 per patient per day from for America he also has information from a consultant who represented nursing homes who negotiated contracts with for America and knows he had the actual contracts where and this was on the West Coast those contracts had the per diem rate with the true up clauses what aspect of that can you say was not in the public domain in other words why shouldn't the public disclosure bar apply in this case why shouldn't it because the allegation and transaction of fraud was not disclosed it was not a universal widespread fraud that was disclosed it was a guidance the government issued guidance to make sure that the nursing homes were acting in an ethical ethically and lawful way and what the effect of the district court's holding would have it was an immunized entire industry it was what we offered was very very specific information it would be akin to the Cooper case in the 11th circuit where there was a widespread disclosure of Medicare secondary payer fraud and what the court held was that that was not an allegation or transaction of fraud it was you know it was just it would it would go against the purpose of the false claims act which would be to encourage whistleblowers and you know protect the government parasitic lawsuits this lawsuit was not a parasitic lawsuit the government was not placed on the trail of the fraud our related brought information he studied documents that the government would have never have seen and even if they had seen the transactions between for America and nursing homes they wouldn't have known when you say information do you mean pricing information pricing information contracts information regarding knowledge they were competing with Omnicare a consultant so is it fair to say that you did not discover that the fraud was taking place you you just took public information and made it more precise that we would not go ahead and correct my my comment we we we would not say that that was the case we would say that we uncovered this fraud the government would not have known that this fraud was occurring they would not have been able to start an investigation without our information and and we believe that the public excuse me your honors the district court aired when it applied the industry-wide public disclosure bar there are some courts that have adopted it but in us at al-prixil versus Sodexo which is a non-presidential version of the district court third-circuit opinion that adopt the analysis of the lower court we think they did a great job of synthesizing the cases and I think it's a great job to yeah I agree and and what they said there what the court said there was that if the fraud occurs on a transactional level and individual perpetrators are difficult to discern then then the industry-wide public disclosure bar that doesn't apply and is that that is exact case here let me ask you another thing I mean if you you persuasively I think argued in your reply brief that hey the red brief only discussed reliance by your client and the analysis should be something different maybe you could just kind of crystallize for us how the district court got it wrong perhaps sure the district court referenced Mr. Silver's testimony in his deposition and it aired in doing that and if it relied on that it was wrong because the case law is absolutely clear that for a public disclosure analysis relators independent knowledge is irrelevant it only becomes into play when it in the original source analysis in a case u.s. extra mystic 1990 case of a third 99 case on the Third Circuit this was a case where the relator previously filed a suit in the state court that had the same allegations and then he subsequently filed a key tamp case the court found that it would publicly disclosed all of the allegations were already out there he said you know what no I didn't use those public disclosures I'm the one that disclosed it I use my independent knowledge to draft this complaint and the court said your independent knowledge is irrelevant what you relied on is irrelevant for a public disclosure analysis it's only relevant for an original source analysis well I'm concerned about the your discovery of fraud and I wonder if you really did discover fraud if I if I were to think that you did not but you because of you Silvers experience and he did seem to have a lot of experience he took all the pieces that were out there put them together including the numbers and concluded that there was a fraud does that entitle Mr. Silver to recover well the first step in a more fisheries outlines there's a multiple set process and the first step would be discovering if finding that there's an allegation of transaction of fraud has been publicly disclosed we would argue that that has not happened the second last step would be if the court does find that is publicly disclosed to see if it's substantially similar I understand your chart was very helpful and we would argue that if the court were to find an allegation of transaction of fraud was publicly disclosed it's not substantially similar to the complaint the complaint as vital details and in the a couple of circus a third circuit has not defined substantially similar to do that in this case we don't think so we think it stops at first we don't believe that the allegation of transaction of fraud was publicly disclosed so we think it stops there okay thank you we'll hear from you on rebuttal good morning your honors my name is Michael Manti and I represent for America Corporation this is an unusual but simple case it's unusual because the relator in this case admitted under oath that he could only rely on the public disclosures in crafting his complaint and that's because he had no prior relationship with for America he had no business relationship with them he did not work with them he had no connection with any of the employees but didn't he bring something to the table you know I a lot of your briefs seemed you know very sort of one-sided a lot of what you wrote I mean as if this was it he did bring some expertise and some information to the table didn't he well I think his expertise is a different issue that really goes to the original source analysis and it's more in the way of background information what he did bring and I beg to differ with my colleagues description he did not bring the costs he did not know what the costs were he admitted in his deposition that he had no idea whether the prices in the contracts that he brought to the table were below cost or not he had no idea whether they involve swapping and in fact we have the so-called his colleague Mr. Lennox also on the record saying that the prices in those contracts which he negotiated were fair market value and that he as the intermediary between the pharmacy and the nursing home negotiating the pharmacy contract never accepted a Part A offer in exchange for any type of Part D or Medicaid business so the evidence in the record as opposed to what's been alleged in the complaint and at this stage they can't rely on the complaint anymore they have to come they have to come forward with affirmative evidence showing that the court has jurisdiction or that the court should not dismiss the case under the post-papaka version well I mean I for instance one of the things you point to in the appendix 688 to 689 there's the 10k form right yes I mean he may have relied on this but I don't see where I know I'm not an accountant but I don't see where this discloses a fraud or discloses the scheme you know generally well but again I think to Judge Fuente's observation earlier what Mr. Silver did was he combed the public record in search of information about Pharmaerica and then he packed it together into a complaint and what we need to do the exercise in terms of the first stage of the prior public disclosure analysis is to determine not whether there's fraud in the abstract it's not an abstract inquiry it's whether the allegations publicly disclosed are similar to or substantially similar to the allegations in the complaint and here because he had no information about Pharmaerica about its granular costs by which you could excuse me its costs at a nursing home level payer by payer all he could do was rely on the financial statements there was a sense that there was fraud out there but Mr. Silver I suppose maybe you could say to his credit put all those pieces together and came up with the game plan there was fraud going on but for him let's say the case would not have been filed but I don't think that's true either because first of all let's back up a step that really again I think goes to the original source argument here you know at the very beginning we have to look at the whether there was a whether the complaint was based upon allegations and transactions publicly disclosed in certain public disclosures we have him on record admitting and that is sufficient in and of itself to move to the second phase and I can move to the second phase and discuss whether his industry expertise really what he has is an experience based opinion as this court observed in the Schumann case and that is not sufficient to establish direct and independent knowledge sufficient to establish yourself as an original source what about the post 2010 time period the information he provides is materially adding to what was in the public disclosures well and this and I'm going to come back to your question Judge Chigars about the 10 case well then the question is whether it materially adds and it doesn't because what we have is the additions the significant additions that Mr. Silver alleges are his allegations as to what Mr. Lennox would testify to well we have Mr. Lennox testimony and it directly contradicts the allegations in the complaint so that did not materially add to anything that was in the public disclosures you have the contracts themselves Mr. Silver himself testified that he couldn't tell whether those were swapping contracts because he didn't have sufficient information he didn't know whether they were below cost and we have Mr. Lennox saying that the pricing of those contracts were fair market value so those contracts don't add anything so what you're left with is this notion of the true up clauses well the true up clause I think it's not a separate fraud it's just a timing mechanism what the relators are alleging is that swapping generally involves selling something below cost or below fair market value to under the part A provision where the nursing home is financially at risk in exchange for the referral of other business that can be billed at a higher price can you really pass off the true up clauses so quickly I mean it seems to be according to the allegations this is a major part of the scheme of these true up clauses well those are the allegations but I think if you look at the contract really it just turns out to be a timing mechanism the question is is the price below fair market value up front or does it become below fair market value down the road it's the same kickback and it's the same mechanism for paying the kickback which is charging a fee that is allegedly below fair market value so the timing of the payment of the kickback is not a separate fraud and it really doesn't bring anything material to the public disclosures and honestly the notion that Mr. Silver brought swap or per diem pricing to the attention of the government is really laughable his allegations in the complaint itself are that per diem pricing was widespread throughout the industry and certainly per diem pricing in and of itself does not equate to swapping and there is no you can't identify the discount merely from stating what the price is in the contract so again Mr. Silver's testimony is important in this case because on the one hand typically relators are arguing that they didn't rely on the public disclosures in crafting their complaint in this court and every circuit other than the fourth circuit is held that such direct reliance is not necessary to trigger the bar but it is sufficient and it has to be because otherwise you run into a very odd situation where a relator who truly may not have known anything about the prior public disclosure is barred but a relator like Mr. Silver who admits that he relied only on the public disclosures is allowed to move forward so could he say only I mean isn't that a little bit of an overstatement that we've quoted this passage in the in the brief your honor he said I could only rely on what was in the public disclosures and that is true because if you look at the other testimony and even the allegations in the complaint he has no direct personal knowledge of anything about Farmerica he doesn't he never did business with Farmerica he was never employed by Farmerica he never had a contract with Farmerica he admits in his deposition that he had no knowledge of the inner workings of Farmerica he had no knowledge of the inner workings of the company he had no knowledge of their costs so what else was there for him to rely on and I think it's obvious what's going on here and it goes back to what Judge Fuentes observed which is that he has some industry expertise he's not the only one in the world who has industry expertise he gathered all the information up in the public disclosures he took a look at the 10ks figured out what Farmerica's costs were to deliver drugs and he put it together into a complaint and if you look at the complaint itself there's only about 13 paragraphs that say anything about Farmerica and those 13 paragraphs are devoted primarily to alleging what Mr. Lennick would testify to and what Mr. Lennick ultimately did testify to is that the prices that he negotiated and that are reflected in the contracts to which Mr. Silver refers were fair market value and so getting back to your question about the 10k your honor if you look at the deposition testimony Mr. Silver testifies that he was able to find certain data points in the 10k and those were things like the cost of goods sold, the selling SG&A which is selling general administration, their operating income, their net income, the number of beds all the things that he identifies in his deposition testimony actually are in the 10k and you can use this information to make the same exact calculation that Mr. Silver did for his own pharmacy which is to find the average costs per bed per day and it's very simple and you don't have to be Pricewaterhouse to do it I can walk you through it if you want it ends up being $15.50 a day per bed per day routinely interpreted that to mean substantially similar to or supported by so the prior case law I think handles that completely. Insofar as the import of his deposition testimony I think this court has it's well within this court's you know prior decisions it's in a recent non-precedential decision U.S. Exeral Morgan versus Express Scripts. This court found that the complaint was based upon the public disclosures because in evidence was an email that the relator had sent forwarding one of the public disclosures and in that case the court said they need not resort to algebraic representations to determine that the relator based this complaint on the public disclosures and so we have an analogous situation here. And certainly with regard to his expertise and the application of his expertise this is squarely within the U.S. Exral Schuman decision which in a situation where the relator Schuman had worked for one of the alleged conspirators had reviewed the contracts themselves had negotiated the contracts themselves had knowledge of the internal workings of the company the court still found that he wasn't an original source because he relied largely on his experienced belief his experience based belief and that's what we have here. You have a relator who is a self-proclaimed expert in the industry who's gathered together a lot of information that all has been previously disclosed and he as he testifies in his expert opinion he knew or he's assumed that swapping was going on. You don't deny that swapping was in fact going on involving Farmerica and I think there was another one. Omnicare. Omnicare, yeah. But your argument is that that was already public and all Mr. Silver did was put together the math and come to the conclusion that there was fraud. What was public was all the all the indition necessary to infer that Farmerica, we do not, Farmerica does not admit that it was engaged in swapping. In fact, we adamantly deny that and we believe that we would be able to prove that at trial. It's a very complicated, you know, issue but we and specifically the prior public disclosure analysis doesn't require a finding of fraud in the abstract. What it requires is for the court to compare the allegations in the complaint to the publicly disclosed allegations. And again, I think it's obvious what's going on here. So Mr. Silver, a self-proclaimed expert in the industry and I don't doubt his expertise in the long time that he spent in the industry. But what he did, as the district court found, he's the, you know, paradigmatic cryptographer. He put together a lot of things from the public disclosures which led him to an inference and that's the only thing that the complaint alleges is an inference of fraud. And in fact, Mr. Silver testified in his deposition, we cited to it in our briefs, that because he didn't know what our costs were at the nursing home level per customer or our profits were at the nursing home level by payer, he couldn't say whether any contract involved swapping or not. And that was the information he was hoping to get in discovery. So what he actually brought was nothing more than what was already out there in the public disclosures. True, he was able to package it but that is the transaction of fraud upon which he based his complaint. The concept of the transaction of fraud I think is important too because we're not out there looking for, you know, a backdrop. The concealment here is the price, is the cost of the drugs. Can I ask you another question? Your adversary developed their argument about this industry-wide public disclosure bar and their reply brief you didn't have a chance to respond to it. Would you like to hear? I would love to, Your Honor. The court should categorically reject any notion that there is a separate industry-wide disclosure bar. There is only disclosure and disclosure can happen in a number of different ways. It could happen because by naming the specific defendant or it could occur because there is sufficient information in the public record from which or the public disclosures from which the defendant could be directly identified. And this is not an industry-wide public disclosure case because if you look at all of the public disclosures together, several of them specifically identify Pharmaerica. So the reports on the consolidation of the industry. But isn't the whole industry basically three different groups? I mean is it a de facto public disclosure? Well, I think in part it is. Because the question is, is Pharmaerica directly identifiable from the public disclosures? And in this case, they certainly are. And one of the factors to be considered in whether they are directly identifiable is the consolidation in the industry. They clearly, two companies dominate this industry. Pharmaerica and Omnicare. So when you're talking about long-term care pharmacy, you're talking about one or the other of them. Okay? So I think that fact in combination with all of the other public disclosures upon which Mr. Silver admits he relied, including the financial statements, directly identify Pharmaerica in this case. And so I don't think it's necessary for the court in the context of this case to make a broad determination as to the applicability of a so-called industry-wide public disclosure. Certainly not with respect to this relator. I mean, again, going back to sort of the core principle here, this is a relator who admits that he relied on public disclosures to put together his complaint. He's the classic parasitic relator who brought nothing new to the government. And he admits that because the only thing that he had, in addition to the public disclosures, at the end of the day were two contract prices. Let me ask you a question. This is a note that I made after reviewing the district court's opinion. The district court said that the information needed to conclude that Pharmaerica was engaged in swapping was provided by Pharmaerica's own publicly disclosed documents. Is that accurate? I would say that that was a misstatement, or not a misstatement. But if you go further down into the opinion, it says that it was sufficient to draw the inference of swapping, and that's what's necessary to trigger the public disclosure bar. If you go back to Zizek, the transaction of fraud is the true state of facts and the false state of facts sufficient to draw the inference that fraud was occurring. I think ultimately what Judge Hillman determined, notwithstanding some improvident language in that passage, if you look at what he actually held, he found that it was sufficient to draw the inference of fraud, and I believe that was on page 19 or 21 of the order. And this is exactly what Mr. Silver did, is he drew an inference of fraud. He had no actual evidence of fraud, notwithstanding the references to the contracts, because, again, he testified about the contracts. We asked him, and he said, no, he didn't know whether any of those contracts were priced below cost, and the only information in the record is that the prices were fair market value, because that's what his contact, Mr. Lennick, testified. And if you recall, as my colleague explained, Mr. Lennick's job was to negotiate pharmaceutical pharmacy services agreements between long-term care pharmacies and nursing homes, and his job was to get them the best price that they could get. Counsel, I'm afraid we're going to have to cut you off here. The red light's on. Yes, thank you. Thank you. And we'll hear a reply. Thank you. He'll offer just one second. Thank you. Thank you. Thank you. Thank you. Sorry. You can proceed. All right. Your Honor, I'm going to address the testimony, but we don't even get there,  and we don't even get to that point. And the case law is clear, not only in the Third Circuit, but the Ninth, the Second, the Fifth, the Tenth, the Sixth Circuit, that a relator's independent knowledge, what the relator relied on, is totally irrelevant in a public disclosure analysis. It only comes into play during the original source analysis. Well, the question is, did he uncover the fraud? Did he uncover the fraud? Your Honor, yes, he did. We talked a lot about his expertise. He does have a lot of expertise. But he put together non-public information. He put together non-public. May I ask you a question about his deposition testimony? Sure. Did he not testify in a deposition that he required no information beyond what was publicly disclosed in financial records to determine that Farmerica was swapping? That testimony is grossly mischaracterized. And let me put it into. I didn't misread it, did I? There's a section before it is not included. In the section before his deposition, he talks about how he didn't have the gross revenue for Medicaid, he didn't have the gross revenue for Medicare, the net costs of the medication for Medicare, and then have the operational costs below it. And Farmerica, I believe, has those documents somewhere. Now, that type of statement would fully define what I'm looking for and enable me to make a decision whether the Medicare costs for every individual per diem contract or going up the line for a group of homes is below cost or below market value. But I never got that from Farmerica. There is nothing publicly that shows me these things. So I can only rely upon what's out there on the basis of public disclosure. That was page A679 to A680. His testimony for someone that was a parasite. But doesn't that then go to the fact that he took the public disclosures and drew an inference of fraud and that's all he did because he had nothing else to go on? Your Honor, let me put this in a little bit of a perspective. He was deposed for two days. They cited 26 pages of his testimony, only six of which they repeat snippets throughout. They totally mischaracterized it. He's a person that was being questioned by a very, very smart, sophisticated attorney that was trying to get testimony to include in this type of briefing. As we set forth, his testimony isn't even relevant to a public disclosure analysis. It's confusing, but it's not irrelevant. It should only come into play in an original story. What we have to try to discern here is whether the allegations of the complaint are based upon the public disclosures. And we would argue that, first off, there was no public disclosure that contained an allegation or transaction of fraud, and second of all, the complaint was not substantially similar. He added significant facts. What was not in the public disclosure were the contracts, the per diem pricing, the costs. Those were all not in the public available information. Those are things that our client, Mr. Mark Silver, had provided. He's been in the industry. He's spoken with Pharmaerica, spoken with other pharmaceutical companies. He ran a pharmacy. He ran a nursing home, and he obtained specific information, non-public, through those avenues. And the true-up clause is very significant. And what my colleague talked about is just the fact that there's a true-up clause isn't important. The fact is that there is a true-up clause, and it wasn't enforced. That is the key piece of information. Our client knew that that true-up clause, it wasn't enforced. To the onlooker, they would look at the contract. If the government were set on the trail of fraud, they would get the contracts, they would look at the contracts, they would see the true-up clause, and they would say there's no fraud going on here because they're truing up. Our relator testified, and Mr. Lenick, consultant, whose testimony was also grossly mischaracterized, they testified that those true-up clauses were never enforced, and that's a key piece of information that the government didn't know. Are true-up clauses inherent in every swapping scheme? No. I mean, isn't that part of the swap? Somewhere along the quest, the quests are going to be very, very low. They're going to be essentially gifts to the nursing homes. No, the true-up clause basically says we're going to give you a discounted price up front, but the true-up clause says actually it's not discounted because we're going to charge you back later. So it hides the scheme, so it wouldn't appear that they're swapping on the face of the contract. Isn't that part of the swapping scheme itself? No, it's not. And that definitely, I mean, it's part of what the relator brings to the table. It's not part of the swapping scheme that has been in the public available documents. I asked your adversary, is this a case where we're going to have to break new legal ground, or is our jurisprudence sufficient to decide this one? I think the jurisprudence is sufficient. I think it stops at the first, there's no allegation or transaction of fraud. In terms of the second, the Third Circuit hasn't defined substantially similar, but the ZZIT case does a substantially similar analysis. What it just uses, you know, for America in their brief, relied upon the surface-level appeal of partly based upon. It's not, the ZZIT court did do a substantially similar analysis. They didn't define substantially similar. Okay. Thank you, counsel. Thank you. We will take this case under advisement, and I want to thank and congratulate counsel on excellent argument and excellent briefing in this case.